**<u>EXHIBIT C</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Norman Johnson** | : | **CIVIL ACTION NO.** |
| | : | **3:13cv-01531 WWE** |
| Plaintiff | : | |
| vs. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Stephen D. Perry** | : | **MARCH 19, 2015** |
| Defendant | : | |
| | : | |

### AFFIDAVIT OF LORI MIZERAK

The undersigned, being duly sworn, makes oath and says as follows:

1.    I am over 18 years of age and understand the obligations of an oath.

2.    I am counsel to the Defendant, Stephen D. Perry, and have personal knowledge of

the facts set forth herein.

3.    The attached document, designated as Exhibit C, is a true and correct copy of the

transcript of the deposition of plaintiff, Norman Johnson, taken on February 13,

2015.

_____
Lori Mizerak

Subscribed and sworn to before me this 19th day of March, 2015 at Hartford,
Connecticut.

Commissioner Superior Court
Notary Public
My Commission Expires:

BETTY SZUBINSKI
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2017

1

1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3

4

5                          COPY

6

7  NORMAN JOHNSON            :
                      :  NO. 3:13cv-01531WWE

8          v.         :
                      :  FEBRUARY 13, 2015

9  STEPHEN D. PERRY       :

10                     :

11                     :

12

13

14

15             **DEPOSITION OF NORMAN JOHNSON**

16

17

18                Denise M. Mancini, LSR
                  LSR NO. 00357

19

20

21

22

23          A+ REPORTING SERVICES
             P.O. BOX 831

24      WALLINGFORD, CONNECTICUT 06492
            (203) 269-9976

25

1  A P P E A R A N C E S:

2

3               JOHN WILLIAMS & ASSOCIATES
                Attorneys for the Plaintiff
4               51 Elm Street
                New Haven, Connecticut
5                   BY:   JOSEPH MERLY, ESQUIRE

6               OFFICE OF THE CORPORATION COUNSEL
                Attorneys for the Defendant
7               550 Main Street
                Hartford, Connecticut 06103
8                   BY:   LORI MIZERAK, ESQUIRE

9

10  Also Present:  Bonnie Johnson

11

12

13  Transcript Legend:

14  [sic]              - Exactly as said.

15  (Phonetic)         - Exact spelling not provided.

16  [ --- ]            - Break in speech continuity
                         and/or interrupted sentence.
17

    [ ... ]            - Indicates omission of words[s]
18                       when reading OR trailing off
                         and not finishing a sentence.
19

    (As read)          - When reading, adding, deleting or
20                       changing words so as not to be a
                         direct quote from a document.
21

22

23

24

25

3

1          Deposition of NORMAN JOHNSON, the

2    Plaintiff in the above-entitled action, taken at the

3    request of the Defendant pursuant to Connecticut

4    Practice Book Section 13-26, et seq., for purposes of

5    discovery and/or use at trial on Friday, February 13,

6    2015, commencing at 10:34 A.M. before Denise M.

7    Mancini, a Notary Public qualified by law to

8    administer oaths, at the Office of the Corporation

9    Counsel, 550 Main Street, Hartford, Connecticut.

10

11

12              S T I P U L A T I O N S

13          It was stipulated and agreed by

14   counsel that all formalities in connection with the

15   taking of the deposition, including time, place and

16   sufficiency of Notice, were complied with; that the

17   qualifications of the Notary Public were waived; that

18   the reading and signing of said deposition were not

19   waived; and that all objections except as to form were

20   reserved to the time of trial.

21

22

23

24

25

4

```
 1   N O R M A N    J O H N S O N,

 2               the Plaintiff herein, having

 3               been first duly cautioned and

 4               sworn by Denise M. Mancini, a

 5               Notary Public commissioned and

 6               qualified within and for the

 7               State of Connecticut, deposed

 8               and testified as follows:

 9                   THE COURT REPORTER:  Please state your

10               name and address for the record.

11                   THE DEPONENT:  Norman Johnson,

12

13   DIRECT EXAMINATION BY MS. MIZERAK:

14        Q.    Good morning, Mr. Johnson.  My name is

15   Lori Mizerak, and I represent the defendant in the

16   action you brought by way of a complaint dated

17   December 23, 2013.

18               I'm here today to take your deposition.

19   So to start, have you ever had your deposition taken

20   before?

21        A.    No.

22        Q.    Okay.  I'm sure your attorney went over

23   what this process is, but just so we're all on the

24   same page I'll just go through that again for the

25   record.
```

5

1          Essentially this is an opportunity for me

2   to ask you questions about yourself, about the claims

3   you make in the complaint.  Your attorney might have

4   some questions for you as well.

5          We have a court reporter here who is

6   taking down everything we are saying.  So keeping that

7   in mind, although it seems obvious, it is important to

8   answer verbally.  So for example, nods and shakes of

9   the head aren't going to come across on the

10  transcript.

11        A.    Okay.

12        Q.    If I ask you a question and you answer

13  it, I will assume that you understood it.  If you

14  don't understand my question, which may happen if I

15  don't ask it clearly, if there's something you are not

16  quite getting in the question I'm asking, just let me

17  know and I'll try to rephrase it so you do understand

18  it.

19        A.    Okay.

20        Q.    The next thing is if at any point you

21  need to take a break, that's perfectly fine, if you

22  need to do whatever, the only thing I would ask is if

23  I've asked you a question, you go ahead and answer the

24  question and then we can stop and go off the record

25  and you can take a break, feed the meter or whatever.

6

```
 1    I don't think that will happen.  Hopefully we'll get
 2    out of here in not too long, but in case it does,
 3    that's perfectly fine.
 4           A.     Okay.
 5           Q.     Just some preliminary questions before we
 6    get into the actual complaint itself.
 7                  Have you taken any medication today that
 8    would prevent you from understanding any questions I'm
 9    asking?
10           A.     No.
11           Q.     Have you taken any medication at all
12    today?
13           A.     Yes.
14           Q.     What medication have you taken?
15           A.     I take cholesterol medicine and blood
16    pressure.
17           Q.     You told me you have not been deposed
18    before.  Have you ever --
19           A.     Excuse me.  I have, but not on this.
20           Q.     Okay.  You have had a deposition before?
21           A.     Yes.
22           Q.     What was that in conjunction with?
23           A.     It was a car accident.
24           Q.     About how long ago was that deposition?
25           A.     I don't remember.
```

7

1          Q.    You think it was more than five years

2  ago?

3          A.    Yes.

4          Q.    In that car accident that -- I'm assuming

5  you were in a car accident.

6          A.    Yes.

7          Q.    Did you file a lawsuit in conjunction

8  with that car accident?

9          A.    Yes.

10        Q.    And did that car accident case resolve

11  before going to court or did you --

12        A.    Yes, before.

13        Q.    Other than the deposition in conjunction

14  with that car accident case, have you ever been

15  deposed before?

16        A.    No.

17        Q.    And then other than that car accident

18  case where you brought a lawsuit, have you sued anyone

19  before?

20        A.    No.

21        Q.    And have you ever been sued before?

22        A.    No.

23        Q.    That's good.

24               Did you do anything to prepare for the

25  deposition?  And in answering that, I don't want you

8

1    to tell me about anything you talked about with your

2    attorney.

3           A.    No.

4           Q.    Your address was      Road, you said?

5           A.    Yes.

6           Q.    How long have you lived at the      Road

7    residence?

8           A.    Nineteen years.

9           Q.    Do you own that home?

10          A.    Yes.

11          Q.    Presently, who do you reside with at that

12   home?

13          A.    My wife and kids.

14          Q.    How many kids?

15          A.    Three.

16          Q.    And their names?

17          A.                   and

18          Q.    How old are your children?

19          A.    24, 18, 14.

20          Q.    So     is 14,     . is 18, and

21   is 14?

22          A.    Correct.

23          Q.    Going back 2013, did you also live with

24   your wife and three kids at that address?

25          A.    Yes.

9

1        Q.    How long have you been married?

2        A.    July will be 33 years.  Excuse me.  July

3    will be 34 years.  1982.

4        Q.    Have you always lived in Connecticut your

5    whole life?

6        A.    Yes.

7        Q.    How about how long have you lived in

8    Middletown?

9        A.    Over 30 years.

10       Q.    Prior to living in Middletown, where did

11   you live?

12       A.    Meriden.

13       Q.    Are you currently employed?

14       A.    Yes, I am.

15       Q.    Where are you employed?

16       A.    United Technologies, Pratt & Whitney.

17       Q.    What do you do there?

18       A.    I'm a sheet metal fabrication lead.

19       Q.    Can you tell me a little bit about what

20   that means for someone who is not too familiar with

21   that job title.

22       A.    We assemble parts.  I was working over --

23   I had at one time I think 13 guys that I was over, and

24   I assist them in jobs, repairs.

25       Q.    How long have you held that position at

10

1    Pratt & Whitney?

2         A.    I don't recall, but I think it's like 14

3    years.  I've been there 37.

4         Q.    That was going to be my next question.

5    Thank you.

6               So the job you are in now, do you

7    supervise other workers in that job?

8         A.    Not supervise, assist.

9         Q.    Okay.  And then prior to Pratt & Whitney,

10   did you have any other jobs?

11        A.    Yeah, I worked at U.S. Installation, but

12   that was right out of high school.

13        Q.    While at Pratt & Whitney, were you ever

14   the subject of any disciplinary actions at work?

15        A.    No.

16        Q.    Did you ever sustain any type of injury

17   at work, like a work-related accident?

18        A.    Yes.

19        Q.    In conjunction with those, did you have

20   any type of workers' comp claims through your

21   employer?

22        A.    Yes.

23        Q.    Can you tell me just your educational

24   background briefly, starting with when and where you

25   graduated high school.

11

```
 1          A.     I graduated from Orville H. Platt High
 2   School in Meriden, Connecticut in 1972.
 3          Q.     After high school, did you take any
 4   classes in college or any type of trainings or
 5   certifications?
 6          A.     Just training at the job.
 7          Q.     What type of training did you do at your
 8   job?
 9          A.     Learning different things, blueprints and
10   stuff related to the job.
11          Q.     And those training programs, were they
12   programs that Pratt & Whitney put on?
13          A.     Yes.
14          Q.     Now, you live in Middletown, and I know
15   that your daughter        went to Capital Prep at some
16   point.  Did she ever go to Middletown Public Schools?
17          A.     Yes.
18          Q.     And how about your other children?  Did
19   they go through the Middletown public school system or
20   did they go to other schools out of district?
21          A.     Some of both.
22          Q.     So let's talk about    '.  Did he go
23   through the entire public school system in Middletown?
24          A.     No.
25          Q.     So where did      go?
```

12

1        A.          went to -- Gosh.  He went to

2   Roadside Academy.  He went to ECA.  I think it's in

3   Newington.  He went to Shiloh Christian School in West

4   Hartford, and he graduated from Jubilee Academy.

5   Excuse me.  He also went to Xavier.

6        Q.    And because I don't know, but all of

7   those schools you've just listed for me, are those

8   schools outside of Middletown?

9        A.    Three of them were.

10       Q.    Which three were, just so I can write it

11  down.

12       A.    ECA, Shiloh, and Jubilee Academy was

13  online, home school.

14       Q.    Okay.  And ECA and Shiloh, are they high

15  schools?

16       A.    I think they went from kindergarten on

17  up.

18       Q.    And then how about      ?

19       A.    She went to Roadside Academy.  She went

20  to ECA.  There's another one.  I don't remember it.

21  Saint Mary's, and she goes to Consuelo in Hartford

22  now.

23       Q.    And how about        ?

24       A.       . is Roadside Academy, ECA, Shiloh,

25  Middletown High, and Capital Prep, and then Southern.

13

1       Q.      Is she at Southern now?

2       A.      No.

3       Q.      Is she at another college now?

4       A.      She's in the service, and she's looking

5  to get into -- change and go to a different school.

6       Q.      Good for her.  What branch of service?

7       A.      National guard.

8       Q.      So if I understood you, she was at

9  Middletown High before going to Capital Prep.

10      A.      Yes.

11      Q.      What grade would she have been in?

12      A.      In Middletown High?

13      Q.      Yes, thank you.

14      A.      I want to say ninth.

15      Q.      Why did she leave Middletown High?

16      A.      Atmosphere.  There was a different -- We

17 didn't like what was going on in the school.

18      Q.      Anything in particular you didn't like

19 about the school?

20      A.      I can't recall.  It was a lot of stuff.

21      Q.      Can you think of anything that you didn't

22 like about the school?

23      A.      No, not right offhand.

24      Q.      But in any event, there were things going

25 on that you didn't like such that she changed schools?

14

```
 1          A.    Yes.
 2          Q.    Why was the choice made as far as Capital
 3   Prep and her going there?
 4          A.    Well, my wife had came up and she had
 5   checked into the school and whatnot.  We know the
 6   Perry family, and my wife thought that that would be a
 7   good fit.
 8          Q.    How do you know the Perry family?
 9          A.    My wife grew up with most of them, and
10   I've worked with a lot of them.
11          Q.    And would these be relatives of
12   Mr. Perry, the defendant in this action?
13          A.    Yes.
14          Q.    Did either you or your wife know
15   specifically Mr. Perry before the incidents -- before
16   your daughter went to Capital Prep?
17          A.    My wife and her family did because
18   they're from Middletown.
19          Q.    And Mr. Perry is from Middletown too?
20          A.    Yes, they grew up together.  I work with
21   his uncle every day.
22          Q.    So when        went to Capital Prep, what
23   year was she in?
24          A.    I believe it was ninth.
25          Q.    Did your children go to Middletown public
```

15

1   schools in elementary school?

2      A.   That was Roadside Academy.  It's a --

3   actually a private school.  Most of them was actually

4   private schools.

5      Q.   I want to talk a little bit about the

6   complaint.  So I'm going to point to various

7   allegations in the complaint to get a little more

8   information about them.

9         (Whereupon, Defendant's Exhibit 1, the

10   complaint, was marked for Identification.)

11   BY MS. MIZERAK:

12      Q.   So I'm putting before you a document

13   that's been identified as Exhibit 1, and it's a copy

14   of the complaint in this case.

15         I'm going to turn to the first page.  I

16   just want to take a look in the first count on that

17   first page, the fifth paragraph.  And the fifth

18   paragraph says, The defendant, having decided that he

19   wanted Capital Prep to win a state girls basketball

20   championship, recruited the plaintiff's daughter to

21   play basketball for the school.  He did so knowing

22   fully well that she was a good basketball player, but

23   not good enough to play at a varsity championship

24   level, however, he needed an additional girl on the

25   team to fill out its roster, otherwise, the team would

16

1    not have been able to compete for the championship he

2    desired.  As a result, the plaintiff's daughter was

3    placed on the varsity team but rarely allowed to play.

4              So I want to ask you a couple of

5    questions about that.

6              How did Mr. Perry recruit your daughter

7    to play basketball?

8         A.    When my wife initially went to school

9    for -- to get my daughter in, his first question was,

10   Does she play sports?

11             My wife says, Yes, she played for

12   Middletown High.

13             My daughter started school the next day.

14        Q.    And were you aware at that meeting that

15   there's a two-sport requirement at Capital Prep?

16        A.    Yes.

17        Q.    During that initial meeting that your

18   wife had with Mr. Perry, other than the question does

19   she play sports, was there any other discussion about

20   sports or basketball in particular?

21        A.    I wasn't there.

22        Q.    To your knowledge, are you aware of any

23   other conversations other than that question, does she

24   play sports?

25        A.    It was based on sports.  It was what does

17

```
 1    she play.
 2         Q.    That was the question, what does she
 3    play?
 4         A.    Yes.
 5         Q.    That's the only thing you are aware of
 6    what questions were asked?
 7         A.    That's all I'm aware of.
 8         Q.    I understand you weren't at the meeting.
 9               Then you indicated she started school the
10    next day?
11         A.    I believe it was the next day.
12         Q.    Again, I know you weren't at that
13    meeting, but did your wife tell anything else that was
14    discussed at that meeting?
15         A.    About the two sports, a little bit about
16    the curriculum and stuff.
17         Q.    And I would assume your wife may have
18    said why she wanted -- why you wanted    . to go to
19    Capital Prep.
20         A.    Yes.
21               Oh, there was something.  I hate to go
22    back.
23         Q.    No, please.
24         A.    But it was like the curriculum from the
25    public school.  That's one of the reasons my kids were
```

18

1    in private school.  We could not find a good public

2    school in the area.  I'm sorry to go back.

3          Q.    No, no.  That's fine.

4                What were you looking form, ideally, for

5    your kids as far as a curriculum?

6          A.    A good education.

7          Q.    Prior to that meeting that Ms. Johnson

8    had with Mr. Perry, did you know anything about the

9    curriculum at Capital Prep?

10         A.    No.

11         Q.    Was there any time, you know, days or

12   weeks, between when        left Middletown High School

13   and then started up at Capital Prep?

14         A.    I don't believe.

15         Q.    And Mr. Perry didn't know         prior to

16   her coming to Capital Prep, did he?

17         A.    No, I don't believe so.

18         Q.    Now, in paragraph 5 in the complaint, the

19   statement, he did so knowing full well that she was a

20   good basketball player, but not good enough to play at

21   a varsity championship level, is your claim that he

22   knew that during that first meeting that Ms. Johnson

23   had with him prior to      . coming into the school?

24         A.    Can you rephrase that.

25         Q.    I'm trying to understand whether it is

19

```
 1    your claim that that first meeting that Ms. Johnson
 2    had with Mr. Perry prior to ᴄ  . entering Capital
 3    Prep, is it your claim that Mr. Perry knew at that
 4    point in time that       played basketball but she
 5    wasn't good enough to be on the varsity basketball
 6    team?
 7         A.    No, he knew that she played for
 8    Middletown High.
 9         Q.    And that's all he knew at that first
10    meeting?
11         A.    Correct.
12         Q.    Now, the state basketball championship,
13    the Capital Prep team won that.  Was that in 2013?
14         A.    Yes, I believe.
15         Q.    Now, while your daughter was at Capital
16    Prep, had the basketball team made the state
17    championship at any time prior to 2013?
18         A.    Yes.
19         Q.    Do you remember what year that was?
20         A.    The year before.
21         Q.    So 2012 and 2013?
22         A.    Mm-hmm.
23         Q.    Did they win in 2012?
24         A.    No, they did not.
25         Q.    Also in paragraph 5 there's an
```

20

1    allegation, However, he needed an additional girl on

2    the team to fill out its roster, otherwise, the team

3    would not have been able to compete for the

4    championship he desired.

5              So I don't know a whole lot about high

6    school basketball.  Is there some policy or rule that

7    dictates how many players must be on a roster in order

8    to participate in a state championship?

9         A.    Yes.

10        Q.    Where does that policy or rule come from?

11        A.    Probably Basketball Association.

12        Q.    What does that rule say?

13        A.    I do not know.

14        Q.    Do you know what it says as far as how

15   many students must be on a team in order to compete in

16   a state championship?

17        A.    No.

18        Q.    The 2013 state championship game, do you

19   know what month that occurred in?

20        A.    I believe it was March.

21        Q.    March of 2013.  Okay.

22              And in March of 2013, was        on the

23   varsity basketball team at Capital Prep?

24        A.    I believe she was just on JV because she

25   played both.

21

1      Q.    Now, Mr. Perry, was he somehow a

2   basketball coach too at the same time, or no?

3      A.    No.

4      Q.    And to your knowledge, was he involved in

5   any process that would have occurred as far as

6   students trying out for the basketball team and being

7   selected for the team?

8      A.    Rephrase that.

9      Q.    Sure.  I guess I'm making an assumption

10  that, you know, when kids want to be on a particular

11  team, like the basketball team, they have to try out

12  for it.

13           Assuming that's the case, do you know if

14  Mr. Perry would have been involved in that process of

15  selecting kids for the team?

16      A.    I do not know, but they were required to

17  play two sports.  So some of the kids did not have a

18  choice.

19      Q.    So some kids, they wanted to be on the

20  team and they were on the team, and that would satisfy

21  the sport requirement?

22      A.    Yes.

23      Q.    So we'll talk about the February meeting

24  soon, but I want to focus a little bit on prior to

25  that.

22

```
 1              So prior to that February 7th, 2013,
 2    meeting that you had with Dr. Perry -- and there were
 3    other people at that meeting, which we'll talk
 4    about -- had you had any conversation with the
 5    basketball coach regarding play time for your
 6    daughter?
 7         A.    Yes.
 8         Q.    Who was the basketball coach?
 9         A.    Tammy Millsap.
10         Q.    And can you remember roughly -- if you
11    can remember, a month, a year -- the first time you
12    had a conversation with Coach Millsap about play time
13    for (    ?
14         A.    Not really.
15         Q.    Do you think it was prior to        's
16    senior year in high school?
17         A.    Yes.  Excuse me.  Yes, it had to be her
18    junior year because she was the coach, I think, for
19    the junior and the senior year.
20         Q.    Something I should have asked you, when
21         started Capital Prep in, we think, freshman
22    year, ninth grade, did she -- was she on the
23    basketball team in ninth grade?
24         A.    I think so.
25         Q.    And then was she on the team in tenth
```

23

1  grade too?

2       A.    I might have my dates mixed up.   ·

3  might have came in in tenth grade.  I might have them

4  grades mixed up.  She played two years.  I know she

5  played two years.

6       Q.    Would that have been two years on the

7  varsity team or two years total playing basketball

8  whether it was on JV or varsity?

9       A.    A lot of times she'd play both.

10       Q.    Would it be fair to say there were some

11  students like ·      that played for the varsity team

12  but also the JV team?

13       A.    Yes.

14       Q.    So what did you talk about with Coach

15  Millsap specifically as far as play time?

16       A.    Well, I used to take        to her

17  practices a lot of times and -- we would go to all

18  their games, and I would tell her what do I have to do

19  to get       more playing time because I can work with

20  her.

21       Q.    Did you not think that       . was getting

22  sufficient play time?

23       A.    No, I did not.

24       Q.    And did you feel that way from the get

25  go, so from her first year on the team?

24

```
 1          A.    After ·    's first year on the team,
 2   ████     was not going to play the senior year because of
 3   the issues.
 4          Q.    And what issues were those?
 5          A.    Playing time, just not being fair.
 6          Q.    Can you give me some examples of not
 7   being fair?  What wasn't fair?
 8          A.    It seemed -- And here I'm speaking for my
 9   daughter.
10          Q.    I understand.
11          A.    She would say that she would favor other
12   girls; she would punish her.  And     ⸱ was the reason
13   for a lot of the girls that played the senior year,
14   they weren't going to play.        is a leader.
15          Q.    And so when you said "she" before, you
16   were talking about Coach Millsap?
17          A.    Yes.
18          Q.    Did      tell you about these issues
19   that she was having with the coach?
20          A.    Oh, yes.
21          Q.    Again, if you can remember, when were the
22   issues -- Did they really sort of come to a head such
23   that you had to speak to Coach Millsap?
24          A.    Me and her, we talked all the time.  At
25   the games, if JV was out there playing, sometimes we
```

25

1  would sit together and talk about the games.

2      Q.   Did Coach Millsap ever give you some

3  ideas of what you could do such that      could get

4  some more play time?

5      A.   No, she just said that she wasn't going

6  to guarantee nobody no amount of play time.

7      Q.   In addition to Coach Millsap, prior to

8  that February 7th, 2013, meeting with Dr. Perry and

9  others, had you met with anyone else at Capital Prep

10  about play time for      ?

11      A.   My wife had requested several meetings.

12  Each time -- I think the first meeting we requested

13  was with Mr. Perry, Chris Fulton, and Tammy Millsap.

14  Wait a minute.  Mr. Perry didn't come to that meeting.

15          There was several attempts to get

16  everybody on the same page because my daughter had

17  already reached her two sports for the year.

18      Q.   And just for timeline, would this have

19  been in 2013 you think?

20      A.   Yes.

21      Q.   So did any meetings ever occur?

22      A.   Yes.  My wife had a meeting with

23  Mr. Fulton and Tammy Millsap.

24      Q.   Do you remember roughly when that meeting

25  was?

26

1        A.      I think it was sometime in January, I

2    believe.

3        Q.      2013?

4        A.      Yes.

5        Q.      Again, I know you weren't at that

6    meeting, but did your wife mention to you what that

7    meeting was about?

8        A.      Playing time and my daughter playing

9    basketball.

10       Q.      Again, would it have been your feeling

11   that she wasn't getting enough play time?

12       A.      That and the point that my daughter did

13   not want to play for her no more.  There was two

14   coaches.  There was Coach Lewis that had JV.  So she

15   would fulfill the rest of her obligations playing JV,

16   seeing that's where she was getting her time at.

17       Q.      I think you mentioned before that your

18   daughter had met the two sport requirement.

19       A.      Yes, because she played soccer.  And you

20   have to remember, they go to school all year round

21   from July.  So she played soccer, basketball and

22   lacrosse.  She played a couple of sports.

23       Q.      So you told me about that meeting with

24   Mr. Fulton, your wife and Ms. Millsap.  Any other

25   meetings?

27

1      A.     Yes.

2            Q.     Tell me about the next meeting.

3            A.     There was another meeting with me -- My

4      wife had, once again, requested with Mr. Perry,

5      Mr. Fulton, which is the athletic director, and

6      Ms. Millsap.  The only one that showed up was

7      Mr. Fulton.

8            Q.     Tell me a little about that meeting.

9      What happened there?

10           A.     That meeting we discussed      's playing

11     time and whether     . was going to play varsity or

12     just stay on JV.  I told Mr. Fulton that whatever

13            wanted to do, I stood behind it.

14                  At the conclusion of that meeting,

15     Me and Mr. Fulton was laughing, shaking hands,

16     talking.  Everything was settled.

17           Q.     And what does that mean, "everything was

18     settled"?

19           A.            was going to play JV, and that was

20     it.  This is coming up on the next meeting.

21           Q.     That meeting you just told me about, do

22     you remember roughly when that occurred?

23           A.     January, February.  Somewhere in there.

24           Q.     2013?

25           A.     Yes.

28

```
 1          Q.     Any other meetings prior to that February
 2   7th meeting that you had with Dr. Perry and others?
 3          A.     I only had one meeting with Dr. Perry,
 4   and that was that meeting.
 5          Q.     Any other meetings with other individuals
 6   prior to that February 7th meeting?
 7          A.     I did not have.  I think my wife might
 8   have.
 9          Q.     If you look at paragraph 6, The
10   plaintiff's daughter decided she preferred to play
11   only junior varsity basketball so she could have the
12   opportunity to actually play the game.  Her parents
13   concurred in her decision.
14                 That decision, did that occur after the
15   second meeting you told me about that you had with --
16          A.     With Fulton.
17          Q.     And you were there?
18          A.     Yes.
19          Q.     And your wife.
20          A.     Yes.
21          Q.     I think Ms. Millsap maybe?
22          A.     No, no.
23          Q.     Just Fulton?
24          A.     Me, my wife, my daughter and Mr. Fulton.
25          Q.     And we think this was in either January
```

29

1    or February of 2013?

2         A.    Yeah.

3         Q.    And when does the season end, roughly?

4         A.    Sometime in March, I believe it is.

5         Q.    So there was roughly about a month,

6    month-and-a-half left of the season at the time that

7    she made the decision not to stay on varsity would you

8    say?

9         A.    Approximate.

10        Q.    Now, if you can remember, in        's

11   junior year, was Coach Millsap also the varsity coach?

12        A.    Yes.

13        Q.    And did        play varsity in junior

14   year?

15        A.    I believe she played both, JV and

16   varsity.

17        Q.    And on the varsity team in junior year,

18   did she get some play time?

19        A.    Yes, she got some play time.

20        Q.    And in senior year, did she get some play

21   time?

22        A.    Yes.

23        Q.    If you look at the next paragraph,

24   paragraph 7, The defendant, however, pressured the

25   plaintiff's daughter to remain on the varsity team.

1    He summoned her to a private meeting in his office

2    where he cajoled and badgered her, and among other

3    things, told her she better suit up and he didn't want

4    to hear anymore about it.  She reported this

5    conversation to her parents who encouraged her to

6    stick with her own convictions and play only junior

7    varsity if that was her wish.

8            So the meeting that ʿ     had with

9    Dr. Perry, you were not at that meeting, right?

10       A.    No, I was not.

11       Q.    Roughly, do you know when that meeting

12   occurred?

13       A.    Sometime between January and March.

14       Q.    And was it before or after the meeting

15   that you had with Mr. Fulton and your wife and --

16       A.    It was after.

17       Q.    Okay.  It was after.

18            That meeting that you had with Mr. Fulton

19   and your wife, Dr. Perry was not at that meeting?

20       A.    No, he was not.

21       Q.    Now, what did your daughter report

22   happened at the meeting she had with Mr. Perry?

23       A.    She said that Mr. Perry and Mr. Fulton

24   summoned her to his office out of class, and he told

25   her that she better suit up and he didn't want to hear

31

1    nothing about it no more, that she was going to play.

2         Q.    And just to clarify, she was going to

3    play varsity basketball?

4         A.    Yes.

5         Q.    Did she report anything else having been

6    said at that meeting?

7         A.    That he didn't want to hear no more about

8    it.

9         Q.    Now, did      tell you about that

10   meeting when she came home that day?

11        A.    Yes, she told me and her mother.

12        Q.    Just for my clarification, in the

13   discovery responses that were submitted to me a

14   recording was included that had -- it appeared to be a

15   meeting with --      was at the meeting, Mr. Fulton

16   was at the meeting, Mr. Perry was at the meeting.

17             That was not a recording of the meeting

18   that      had that you just described with Mr. Fulton

19   and Mr. Perry where he said, you claim, you better

20   suit up, right?

21        A.    Yes.

22        Q.    That was not the recording of that

23   meeting?

24        A.    Yes, it was.

25        Q.    It was the recording of that meeting?

32

1          A.      Yes.  I heard it for myself.

2          Q.      So the recording you provided was a

3    recording of the meeting that was held between

4    Mr. Perry, Mr. Fulton and      where Mr. Perry said

5    you better suit up?

6          A.      Yes.

7          Q.      Now, if you look at the next paragraph,

8    paragraph 8, The defendant then summoned the plaintiff

9    and his wife to a meeting.

10              That meeting, is that the meeting

11   referring to the February 7th meeting?

12         A.      Yes, but that isn't right.  He called --

13   Well, my wife, once again, wanted the meeting, all

14   parties involved, Mr. Perry the principal, Chris

15   Fulton the athletic director, Tammy Millsap the coach.

16              Mr. Perry called me on my phone, on my

17   cell phone, and told me that he was sick and tired of

18   hearing of my wife requesting these meetings, and I

19   told him that he didn't have to worry about her

20   requesting the meetings because we were going to come

21   to the school to talk to him.

22         Q.      And why did your wife request a meeting?

23         A..     Because they kept badgering my daughter.

24   They were giving her unjust treatment, singling her

25   out for any and every little thing.  They would greet

33

1    the kids when the kids would come to school in the

2    morning, and when my daughter would be coming to the

3    door to come in school, she would get the cold

4    shoulder.

5         Q.    Is it your claim that she was getting the

6    cold shoulder because the decision was made for her to

7    play JV rather than varsity?

8         A.    Yes.

9         Q.    So you had a meeting with Dr. Perry,

10   right?

11        A.    Yes.

12        Q.    And I want to talk a little about that

13   meeting.  Tell me who was there.

14        A.    First off, he kept us waiting for

15   about 45 minutes.

16        Q.    Okay.  Let me back you up so we can get

17   there.  He called you on your cell phone, you said.

18        A.    And I told him we were on our way to the

19   school.

20        Q.    So that all happened on the same day, the

21   call and going to the school?

22        A.    Yes.

23        Q.    Okay.  So you go to the school.

24        A.    Yes.

25        Q.    Who is going to be in the meeting?

34

1           A.    It's my wife Bonnie Johnson,

2    Johnson my daughter, another lady; I don't know her

3    last name, but first name is Millie, and Mr. Perry.

4           Q.    When he called you on your cell phone,

5    did he tell you to come down at a particular time?

6           A.    He just said okay.

7           Q.    And that was in response to you saying

8    we're coming down for a meeting?

9           A.    We are on our way.

10          Q.    And you started to tell me you had to

11   wait for quite awhile.

12          A.    Yes.

13          Q.    Where did you wait?

14          A.    In the conference room.

15          Q.    After you waited for about -- what did

16   you say -- about 45 minutes?

17          A.    Approximately.

18          Q.    You go into the conference room, and

19   who's in there?

20          A.    We're in the conference room, and he came

21   in.

22          Q.    Any other staff people from Capital Prep

23   in that meeting?

24          A.    No.

25          Q.    And Millie was also there?

35

1       A.      Yes.

2       Q.      Who is Millie again?

3       A.      I don't know her actual title.

4       Q.      Do you know what she does?

5       A.      Something with the school and the

6    students.  I think I have it on the papers.

7       Q.      She does not work at Capital Prep,

8    though, to your knowledge?

9       A.      To my knowledge.

10      Q.      So tell me about the meeting.  What

11   happens?

12      A.      Well, we start out, my wife was telling

13   them about them bullying my daughter, and Mr. Perry

14   said that it was not bullying.  Millie told him that

15   yes, it was.  So he kind of shrugged his shoulders,

16   like, Really?

17      Q.      And I don't mean to interrupt you, but

18   the bullying, what are you referring to?

19      A.      The bullying, talking to her, pressuring

20   her to remain on the team and play.  Just seemed like

21   from the point that she decided that she wasn't going

22   to play JV no more, that she was a target.

23      Q.      Who was pressuring her?

24      A.      Mr. Perry.

25      Q.      And if I understood you correctly, there

1  was one meeting that      . had with Mr. Perry about

2  playing time for basketball, right?

3          A.    No, I never said that.

4          Q.    There were multiple meetings?

5          A.    I don't know of any meeting that she had

6  with Mr. Perry about playing.

7          Q.    So how did he pressure her?

8          A.    His private meetings calling her out of

9  class with him and Mr. Fulton.

10         Q.    So there was a meeting about basketball?

11         A.    Yeah, but it wasn't about playing time or

12  nothing.

13         Q.    Got you.  That was one meeting?

14         A.    That's the one that I know of.

15         Q.    Did she tell you about any other

16  meetings?

17         A.    I don't recall.  It's been two years.

18         Q.    I know it's been a while.  But you know

19  of one meeting?

20         A.    I know of that one.

21         Q.    Any other bullying, any other things that

22  are constituting bullying in your mind?

23         A.    She would say that he would say stuff to

24  her about her dress attire, just -- It seemed like

25  whatever she did, that he had to say something

37

1    negative to get after her about.

2         Q.    When would he say these things?

3         A.    As she's coming down the hall or...

4         Q.    When he would say these things, would he

5    also say something about basketball and her deciding

6    to not play on the varsity team?

7         A.    I don't know.

8         Q.    Any other bullying examples?

9         A.    I can't recall at the moment.

10        Q.    So -- I'm sorry to interrupt, but go back

11   to the meeting of February 7th.  What was happening at

12   the meeting?

13        A.    So after my wife had told him about the

14   bullying, and then I asked him why was he continuing

15   to talk to      about basketball when we asked him

16   not to; and we requested that he be in these meetings

17   so that everybody involved would be on the same page,

18   and he said that he didn't have to be there.  He had

19   people to take care of it.

20        Q.    Then what happened?

21        A.    We had a situation -- this is -- We had a

22   situation prior to this meeting where at a game

23   was not getting no playing time.  She just sat on the

24   bench, and my wife was going over to say something to

25   Ms. Millsap, the coach, about her playing time, and

38

1    another parent disrespected my wife.

2            So I went over to say something to

3    Ms. Millsap, and I knew the other parent and I know

4    her parent.  So I said something to them, and when I

5    went to talk to Ms. Millsap, she, like, told me she

6    didn't have time, she would talk to me another time.

7    So I said okay, from this moment forward she won't be

8    playing for you; she will be playing for Ms. Lewis,

9    which is the JV coach.  That was -- I believe that was

10   the 29th of January.

11           That night me and my family went to a

12   family gathering, and my wife was getting text

13   messages and stuff from the parent.  I tried to call

14   Mr. Perry to alert him about the possibility that the

15   girls would get into a fight, this and that, whatever.

16   I called Ms. Millsap, but she would not give me

17   Mr. Perry's number.  He had initially gave me his

18   card, but I couldn't reach him.  I didn't have his

19   card.

20           So I called Mr. Fulton and told him about

21   it, and he said he would get everything squashed.

22   This was before this meeting.  This is before the

23   meeting.

24       Q.    Right.  Did you talk about that situation

25   at the February 7th meeting?

39

1          A.     I think we tried to, but it seemed like

2     any time anybody tried to say anything, Mr. Perry

3     would talk over them, you know, made it seem like it

4     was nothing, and he kept saying to my daughter, Really

5          ., really?

6               And it seemed like every time we got

7     ready to ask him a question, he would divert it to

8     something else.

9               So while we was talking about this

10    incident -- And like I said, every time we got ready

11    to ask a question, he would interrupt.  So I told him,

12    I said, Excuse me.  I said, I have one question and

13    I'm done; I won't bother you.

14               I asked him if it was true, if he made

15    the following statement to my daughter:  You better

16    suit up; I don't want to hear no more about it.  You

17    will play.

18               He looked me dead in my face and said,

19    She's a liar and a manipulator.

20               And he looked at Millie and he said, You

21    know who to believe.

22          Q.     After he said that, what happened?

23          A.     I, in turn, slammed my hand and said, No,

24    you are a liar and a manipulator, and you are full of

25    crap.

40

1        I'm sitting down just like this.  It was

2   at a round table.  He jumped up and started hollering

3   at me and going crazy and whatnot, and he said that

4   the meeting was over.

5        Q.    Were you sitting the whole time during

6   the meeting?

7        A.    Yes, I was.  He told me not to talk to

8   him like that.  I said, It was okay for you to talk to

9   my daughter like that?  I said, What were you going to

10  do?  Get up and leave.  It was all right for you to

11  manipulate my daughter right in front of us?

12       Q.    So how were you feeling at that meeting?

13  Were you mad, happy?  What was going through your mind

14  at that meeting?

15       A.    I was, like, I can't believe this.  He

16  made a statement, and that's probably why he blew --

17  Well, he made a statement that, Well, I know you got a

18  way of approaching people.

19            And I told him, I said, I'm glad that you

20  made that -- because I'm over that.

21            But what happened was at one game I asked

22  him a question, Do the girls have access to the

23  lockers in the locker room because someone had stole

24  my daughter's blazer that we paid for.

25            And he told me, What are you asking me

41

1  for?  I don't get involved in that stuff.  That's

2  between her and the coach.

3            So I told him in this meeting when he

4  brought that up, and I said, Yes, I said, And you were

5  very arrogant; you tried to snap my head off.  I asked

6  you a simple question, and you tried to snap my head

7  off.

8       Q.    Now, in paragraph 10, In fact, the

9  defendant was lying; the plaintiff's daughter was

10  telling the truth.

11            What does that refer to?

12       A.    The statement he made.

13       Q.    The statement being about -- the one you

14  better suit up?

15       A.    Yes.

16       Q.    Paragraph 9, At that point, the plaintiff

17  raised his voice and told the defendant he was a liar.

18            So you admit that that happened at the

19  meeting, right?

20       A.    Yes.

21       Q.    I think you also said you banged your

22  hand on the table.

23       A.    Mm-hmm.

24       Q.    So what happened next?  You say what to

25  Mr. Perry; he says what to you?

42

1      A.      We got up and left.    There was no --

2   Nothing.  I believe that meeting was on a Thursday, I

3   believe.

4      Q.      Did you hear from Dr. Perry after that

5   meeting at some point?

6      A.      No, I did not.  Excuse me.  We got an

7   e-mail from him, I think it was either that Saturday

8   night or Sunday night, banning me from the school.

9      Q.      And what was your understanding as far as

10  the ban?  What were you banned from?

11     A.      He was banning me from any and everything

12  to do with going on the school property.

13     Q.      And did it also include events that were

14  school events but perhaps not on school property?

15     A.      The e-mail said that.

16     Q.      And what was your understanding as far as

17  how long that ban was to remain in place?

18     A.      E-mail said the only thing that I can go

19  to was commencement ceremony, graduation, then the ban

20  was right back on the next day.

21     Q.      When in 2013 would the commencement

22  ceremony have been?

23     A.      June.

24     Q.      And your daughter would have been

25  graduating in June?

43

1          A.     Yes.

2          Q.     And she did graduate in June, I'm

3    assuming.

4          A.     Mm-hmm.

5          Q.     After graduation, did your daughter have

6    to go to Capital Prep for any reason?  Were there

7    still classes or --

8          A.     No, she was done.  She was done.

9          Q.     So after you received that e-mail, did

10   you contact anyone from the school or the Board of Ed

11   about it?

12         A.     Yes, I did.

13         Q.     Why don't you tell me each of the people

14   you contacted, when roughly, and what you talked

15   about.  Whatever you can remember.

16         A.     I called the superintendent like the very

17   next day.  I never got her.  I never talked to her.

18         Q.     And going back to that time, it probably

19   was Dr. Kishimoto.

20         A.     Correct.

21                I called her several occasions.  She

22   never returned my call.  I never talked to her.  I

23   talked to Jonathan Swan.  He told me that Mr. Perry

24   could not do that.

25                I talked with --

44

1          Q.    I don't mean to interrupt you.  Mr. Swan,
2     do you know what his title is?
3          A.    Assistant.
4          Q.    Superintendent?
5          A.    Superintendent.
6          Q.    Did you talk to him after you made
7     attempts to call the superintendent?
8          A.    Yes, I talked with him multiple times.
9          Q.    Who else?
10         A.    Martha Bentham.
11         Q.    Who is Martha Bentham?
12         A.    I think she's the liaison between
13    parents, student and staff.
14         Q.    What did you talk to her about?
15         A.    Everything to do with my daughter and
16    what was going on.
17         Q.    Everything as related to the basketball
18    playing or --
19         A.    The basketball, grading.  Some of my
20    daughter's grades were changed.  I think she missed
21    opportunities for different colleges because how do
22    you go from her grade -- One of her grades in the
23    class was an A, B, B, final grade is an F.
24              So we was trying to get her to explain to
25    us how does these things happen.

45

1       Q.     Do you remember what class that was in?

2       A.     No, I do not.

3       Q.     Did you talk to the teacher of that

4    class, do you know?

5       A.     No.  At this point I didn't talk to

6    nobody from the school.  Other than -- What do you

7    call it?  Jonathan Swan was the main one that I kept

8    in contact with.  I talked -- called his office almost

9    daily.

10      Q.     The e-mail that you received with respect

11   to the ban going to school events, did it say anything

12   about calling the school?

13      A.     No.

14      Q.     When you spoke to Martha Bentham, did you

15   talk to her about the ban that you -- the ban e-mail

16   that you had received from Mr. Perry?

17      A.     We actually had -- I know my wife had

18   talked to her.  I might have my dates mixed up so

19   don't give me no dates on that.  I explained

20   everything to Jonathan Swan.  He's the main one that I

21   talked to because in the e-mail this ban was supposed

22   to be cc'd to the Board of Ed, the Hartford Police

23   Department, all these different people, and nobody

24   knew nothing about it.

25      Q.     So when you talked to Mr. Swan, he was

46

1  not aware of this ban?

2        A.      He wasn't aware of anything, and he told

3  me that he was going down to the school that day to

4  see what was going on.

5        Q.      Do you know if he did that?

6        A.      He contacted me a couple days later and

7  told me it was going to be an investigation.

8        Q.      Into what?

9        A.      What they say went on and what I did and

10  what was his reasoning for banning me.

11        Q.      Do you know if that ever occurred?

12        A.      No, I do not.  Well, he did tell me

13  that -- Head of security had told this to Jonathan

14  Swan, that he didn't understand that.  He's been doing

15  this job for over 10 years.  No parent has ever been

16  banned from the school.

17        Q.      Did Jonathan ever send you any type of

18  report that summarized any investigation?

19        A.      I'm glad you asked that.  He said he was.

20  He said that he had to go with the way the picture was

21  painted.  They painted a very ugly picture of me, and

22  that he had to go with that until the investigation

23  was over.

24              I asked him, In the meantime, my daughter

25  is still playing sports and stuff; she has to be

47

1   picked up from practice and different things and

2   whatnot.  I'm not allowed on school grounds.  I have

3   to pick my daughter up from down the street.  She has

4   to walk to get a ride.

5           He said that he would send me a letter

6   stating that I could pick my daughter up from the

7   school, but I will also get the letter stating that I

8   cannot go in the school.  Neither happened.

9       Q.    So you didn't get such a letter?

10      A.    No, I did not.

11      Q.    Did you follow up with Mr. Swan or anyone

12  else as far as that particular issue?

13      A.    I called Mr. Swan, like I said, daily.

14  Daily I called him.

15          They had senior night at the school, and

16  Mr. Swan still told me that what Mr. Perry was doing,

17  he could not do, but nobody would go down there and

18  tell him to back off.

19          I went to the Hartford Police Department,

20  and I talked to them.  They had no complaint, no

21  restraining order, nothing.  This leads up to senior

22  night.  It's a lot of stuff.  Don't mind me.  I get

23  emotional with this.

24          They stripped my daughter.  They didn't

25  want to acknowledge her playing anything.  Senior

48

1   night I called Mr. Swan again and asked him if I could

2   go to the school, and he had said that what Mr. Perry

3   was doing he could not do, but he didn't want to see

4   me get in trouble.

5           I was instructed by Hartford Police

6   Department to go to the school, pull in the parking

7   lot, call Hartford Police Department; they would send

8   an officer down, and me, the officer would go in the

9   school with Mr. Perry, and we would resolve this.

10          I get to the school.  I called the

11  Hartford Police Department, and they told me to come

12  down to the police department.  Once again, they have

13  nothing, no restraining order, no incident, nothing

14  about me.  So they tell me to go to the school and ask

15  for the security guard.  His name is Dave.  I don't

16  know his last name.

17          Now, granted there's -- Everybody is in

18  the gym.  I walk in the corridor, and Mr. Fulton

19  reaches out and shakes my hand and asks me,

20  Mr. Johnson, why are you doing this?

21          And I said, Doing what?

22          I said, I talked with the superintendent

23  and he told me, he said, he don't run things here.  I

24  said, I also went to the Hartford Police Department,

25  and they told me to do what I'm doing.

49

1            So he gets on his phone.  He must have
2    called Mr. Perry.  Dave comes out one of the side
3    doors.  Mr. Perry comes running out the gym hollering,
4    screaming, acting like a lunatic, talking like he
5    wants me out of there, out of there.
6            And I said to the security guard, I said,
7    Do you remember the day he was there when we had the
8    meeting -- he was outside the door -- do you remember
9    the meeting that we had?
10            He said, Yeah; what's the matter?
11            I said, I got a letter banning me from
12    school and whatnot.  I told him, Mr. Perry, I said, I
13    was instructed to get security and you and myself and
14    we're going to go to your office and resolve this.
15            He said, That ain't going to happen.  I
16    want him out of here.  Get out.
17        Q.    Did you leave then at that point?
18        A.    Yes, I did.  My wife came out, my
19    niece -- my kids came out to see what was going on.
20        Q.    Sure.
21        A.    That's total embarrassment.
22            The lady that I told you insulted my wife
23    and whatnot, prior to this, well, they're sitting down
24    in front of my wife.  So he goes back in the gym after
25    I leave and hugs the woman and looks up at my family

50

1  like (Indicating) I got him thrown out.

2          He didn't say it, but he gave them that

3  look.  So I left.

4          Q.    So when you called the police department,

5  did you speak to any -- Do you recall the name of the

6  officer you might have spoken to?

7          A.    I might have a card.  I don't recall.

8          Q.    And I think you said when you called them

9  they said it's senior night, go there, to the school,

10  call me from -- call us from the parking lot or

11  whatever you are parking and then they would come

12  down.

13          A.    They would send an officer down, yes.

14          Q.    But then I think you said they told you

15  to go back to the police department.

16          A.    When I got down there and I called them,

17  it might have been somebody different.  They told me

18  just to go to the police station.  It's right around

19  the corner.

20          Q.    And when you were at the police

21  department -- I don't think I understood what happened

22  there.

23          A.    When I got to the police department,

24  different officers was talking, and they were looking

25  in the computer trying to find a restraining order,

51

1    anything, that states why I can't go to the school.

2    And they had nothing.

3        Q.    So to the best of your knowledge, they

4    didn't have a copy of the e-mail that Mr. Perry had

5    sent to you?

6        A.    Right, they said they didn't have nothing

7    about any incident at the school whatsoever.   Swan

8    also didn't have the incident report.

9        Q.    Then did an officer accompany you back to

10   Capital Prep?

11       A.    No, they told me to go back to Capital

12   Prep, ask for security.

13       Q.    Did you have the e-mail with you that you

14   had received from Capital Prep?

15       A.    I believe I did.

16       Q.    You showed it to the police?

17       A.    Yes.

18       Q.    Now, I understand that you had had

19   conversations with Mr. Swan and the police and

20   Mr. Swan didn't understand why the ban was in place

21   and didn't think that Dr. Perry could do that.

22             Did you ever, though, receive any type of

23   e-mail from the school, from Dr. Perry, saying that

24   the ban was lifted?

25       A.    No, I did not.

52

1      Q.    Other than senior night, were there any

2    other events at the school that you attempted to go to

3    after you had received that e-mail from Dr. Perry

4    saying you couldn't go to school events?

5      A.    No, I did not.

6      Q.    Then after senior night, did you talk to

7    anyone at the Board of Ed about what happened?

8      A.    Jonathan Swan.

9      Q.    So you called Jonathan Swan again?

10     A.    Yes.

11     Q.    Did you speak to him?

12     A.    Yes, I did.

13     Q.    What did you talk about?

14     A.    What happened, why am I not allowed, and

15   he still insisted that he can't do it.

16     Q.    Did Mr. Swan ever send you any type of

17   letter saying the ban is lifted?

18     A.    Never, never.  He just insisted that he

19   cannot do that.

20     Q.    When was the last time, if you remember,

21   that you talked to Jonathan Swan?

22     A.    It was after the Mohegan incident.  It

23   was at a public meeting.

24     Q.    You brought up a question I wanted to ask

25   you.  Thank you.  The ban didn't apply to, say, Board

1    of Ed meetings or all board events, right?

2           A.     It said the school.

3           Q.     It said Capital Prep, right?

4           A.     It said the school.

5           Q.     So you were able to go to Board of Ed

6    meetings after that e-mail was sent to you?

7           A.     Mm-hmm.

8           Q.     Anyone else from the Board of Ed that you

9    spoke to about the ban?

10          A.     Martha Bentham's assistant.  I don't

11   recall her name.

12          Q.     Anyone else that you can remember?

13          A.     No, my main connection was Jonathan Swan.

14   I did attempt to call Kishimoto, but like I said,

15   she...

16          Q.     You never talked to her, never able to

17   connect with her?

18          A.     No.

19          Q.     In paragraph 12 in count one, that

20   allegation says, Since that time the defendant has

21   continued to harass the plaintiff by having him

22   escorted from athletic events both at the school and

23   elsewhere.  After the plaintiff's daughter had

24   graduated in June 2013, the plaintiff attended a

25   basketball game at Mohegan Sun at which Capital Prep

54

1   was playing, observing him and the defendant --

2        A.    Could I stop you there.

3        Q.    Let me get it out and then we can talk

4   about it.

5              Observing him there, the defendant

6   instructed police to forcibly remove the plaintiff

7   from the premises.

8              So in looking at the allegation -- You

9   told me about senior night.  Any other athletic events

10  at the school where you attempted to go?

11       A.    No.

12       Q.    The Mohegan Sun game, my understanding is

13  you attempted to go to that game.

14       A.    Mm-hmm.

15       Q.    Now, my question is is it possible that

16  the Mohegan Sun game occurred before your daughter

17  graduated?

18       A.    Yes.  That's why I said the date is

19  wrong.

20       Q.    The game was March 2013?

21       A.    I don't know the exact date, but it was

22  before she graduated.

23       Q.    So tell me about what happened at the

24  Mohegan Sun game.

25       A.    My family wanted to go see the game.

55

1    Schools all around the area.  Once again, I called,

2    whatnot.  He can't tell you you can't go here.  You

3    know, that's all I can tell you.  He can't do what

4    he's doing to you.

5         Q.    You called Jonathan Swan again?

6         A.    From Jonathan Swan.

7               So me and my family went to the game.

8    We're sitting down.  We paid to get in, of course.  We

9    are sitting down, and Chris Fulton comes and kneels on

10   the side of me and he says, Mr. Johnson, why don't you

11   just get up and leave.

12              You know, startled me.  I said, Get away

13   from me and leave me alone.  I'm trying to enjoy the

14   game with my family.

15              So he said, I suggest you get up and

16   leave or we'll have you taken out of here.

17              So I told him to get away from me.  I

18   never stood up, just stayed seated with my family

19   watching the game.  And then I turned around and I

20   looked behind me.  Mr. Perry and his family are

21   sitting about five or six rows up in the stands, and

22   he's standing giving me this look.  He never said

23   nothing.  I never said nothing to him.

24              After that game was over, they all got up

25   and they moved.  His boys, they came down walking in

56

1    front of me and whatnot, but they didn't say nothing

2    to me; I didn't say nothing to them.  We stayed where

3    we were.  They moved to the other side or whatever.

4            A few minutes later, I hear somebody

5    calling me.  And I'm sitting there.  They said,

6    Mr. Johnson, Mr. Johnson.

7            I turn.  There's two un-uniformed guys

8    standing behind me telling me that I had to go with

9    them.  So I'm sitting there, looking at them.

10           I told my wife, I said, I don't believe

11   they are going to try to kick me out.

12           So I got up and walked over to him and he

13   told me that I had to leave, that Mr. Perry said that

14   I was a threat to the community.

15           And I instructed him that my family is

16   among Mohegan descent.  If anybody had any right to be

17   there, it would be me.

18           He asked me if I had any ID.  I told him

19   no, I did not.  He told me that I had to leave.

20           Upon us going through these double doors

21   to exit the arena -- Can I demonstrate something for

22   you?

23      Q.    If it will help you.  And we'll try to

24   describe it as best we can.

25      A.    I stepped through the double doors, and

57

1    there's a police officer standing there like this

2    (Indicating) with his hand on his gun like he's going

3    to shoot me.

4         Q.    Let's try to describe that, if we could.

5    You were standing --

6         A.    I came through the double doors, and

7    there's an officer on the other side -- They cleared

8    the corridor like I was some convicted felon, and

9    that's what I told the guy.  I said, You're kicking me

10   out of here?  You don't even know how many felons you

11   have in this place.  You have a woman that started a

12   riot at the school.  She's sitting right behind the

13   basketball team.

14          The police officer is standing there like

15   this (Indicating) with his gun unclipped.  Six to

16   eight security surround me.  They took me out.

17        Q.    And when you were standing, you were

18   standing with your hand on your hip to --

19        A.    No, no --

20        Q.    -- to demonstrate where the officer was

21   holding his gun --

22        A.    Oh, yes.  When I came out, I came out

23   like this (Indicating) with my hands away from my body

24   asking what was going on.  He said that Mr. Perry said

25   that we had an agreement and that I was a threat to

58

1   the community and I was not supposed to be there and

2   he wanted me gone.

3          Q.    And at that Mohegan Sun event, Capital

4   Prep was playing?

5          A.    They was one of the teams, yes.

6          Q.    The security people that told you you had

7   to leave, they were Mohegan Sun security people, to

8   your knowledge?

9          A.    Yes, they were.

10         Q.    And then you left?

11         A.    They told me I had to leave the arena.  I

12   did not have to leave the casino.  I just could not be

13   in the arena.

14               As they are escorting me out, one of the

15   workers is coming in and she makes a statement, I know

16   you are in trouble; look at all the security around

17   you.

18         Q.    And prior to the Mohegan Sun game in

19   March 2013, you hadn't received any type of e-mail or

20   letter from Dr. Perry saying the ban was lifted,

21   right?

22         A.    Nothing.

23         Q.    In paragraph 12, that first statement

24   that says, Since that time the defendant has continued

25   to harass the plaintiff by having him escorted from

59

1    athletic events both at the school and elsewhere.

2              I just want to make sure I have all of

3    the events.  We talked about the senior night event.

4    We talked about the Mohegan Sun game.  Is there

5    anything else, any other events?

6         A.    That's probably after my daughter

7    graduated.  I don't know if it's just intimidation or

8    what.  I was at car dealership one day, and he pulls

9    in staring me down and, you know, goes down to a pawn

10   shop or something and turns around and comes back out,

11   and I just felt what-was-that-about.

12        Q.    Where did that occur?

13        A.    In Middletown.

14        Q.    In paragraph 12 when -- the reference to

15   harassment to the plaintiff with respect to the two

16   events, school events that we discussed, the senior

17   night event and the Mohegan Sun event, was the

18   harassment that you were -- had to leave those events

19   and couldn't attend those events?

20        A.    Correct.

21        Q.    I'm sorry if I already asked you this,

22   but at the Mohegan Sun event, did you and Dr. Perry

23   have any conversation at all?

24        A.    None whatsoever.

25              MS. MIZERAK:  Can we mark this.

60

1          (Whereupon, Defendant's Exhibit 2,

2     discovery responses, were marked for Identification.)

3     BY MS. MIZERAK:

4          Q.    Mr. Johnson, I'm handing you another

5     document that has been identified as Exhibit 2.  These

6     are the discovery responses that I received.  I'm just

7     going to ask you a couple questions about the

8     documents attached to it.

9          A.    Okay.

10         Q.    So I think just so it's easier, I'm going

11    to point you to various pages that I want to take a

12    look at.  Okay?  So I'm going to, if I could, just

13    take this from you for one moment, that way we don't

14    have to take too much time flipping around.

15              So if you look in the middle of the page

16    there's an e-mail, looks like January 31, 2013, at

17    5:34 p.m., and it's addressed to a Felicia Bumpus, it

18    looks like.

19         A.    Felicia.

20         Q.    Who is Felicia?

21         A.    Felicia, she -- I don't know if she works

22    for the school, but she was doing a lot for the school

23    as far as like the senior night for the banners and

24    all that stuff, the programs.

25         Q.    And for my knowledge, what exactly is

61

1    senior night?

2         A.    Senior night is where they honor the

3    seniors for the sports that they have played.

4         Q.    And that e-mail, in the middle of the

5    page, on January 31, 2013, at 5:34 p.m. Norman Johnson

6    wrote, Hi, Felicia.  I'm sorry I didn't respond

7    sooner.  So much going on.        will definitely not

8    be playing on the varsity team on senior night.

9              Do you remember writing that e-mail?

10        A.    My wife -- my wife was -- That's my

11   e-mail.

12        Q.    Got it.  So it appears that on

13   January 31st there was a decision that she's not going

14   to be playing on the varsity team on senior night.

15   Based on that e-mail at least.

16        A.    Correct.

17        Q.    Then if you turn about seven pages, if

18   you could look in the middle of the page, again,

19   there's another e-mail to Felicia dated February 2,

20   2013, and the front line is, again, Norman Johnson,

21   and this e-mail looks like it's from Bonnie,

22   Ms. Johnson I'm assuming.

23        A.    Mm-hmm.

24        Q.    And this e-mail, Hi, Felicia.  Yes, J can

25   be included in the booklet.  I will send you her info

62

1    ASAP.  She can also be escorted out to center court.

2              So on February 2nd it appears that the

3    thought was    : could go out on center court, at

4    least for senior night.

5         A.    Right.

6         Q.    Would she be playing or --

7         A.    No, no.  She would just be -- The thought

8    was that she was being honored for her past sports.

9         Q.    Because at that point she wasn't on JV?

10        A.    She was not on varsity.  She was on JV.

11        Q.    Okay.  How did that decision come about,

12   that she could be escorted to center court, if you

13   know?

14        A.    I don't know.

15        Q.    Mr. Johnson, what damages are you

16   claiming were caused by Mr. Perry?

17        A.    Well, my civil rights, not allowing me to

18   support my daughter in any of her endeavors, the

19   embarrassment and harassment that he caused me and my

20   family, and -- I don't even know if it's in my file --

21   the slander of labeling me like I'm some type of

22   terrorist.

23              I have not been able to -- since my

24   daughter graduated -- And I know this is stepping off.

25   We used to all -- We support our kids.  We go to all

63

1    the games that we could.  So I was not able to go to

2    none of the games, whether it be boys or girls, that

3    my kids would go to.  It wasn't able to go to none of

4    that.

5              I attended a game for a different school,

6    and as soon as I stepped in the door, a parent says to

7    me, Is that cop over there for you?

8              Because everybody knows about it.

9         Q.    Did she tell you how everyone knows about

10   it?

11        A.    The gym at Capital Prep was full.  All

12   the students, all the family.  Mohegan Sun, all the

13   people at Mohegan Sun.  I have family -- Everybody

14   that knew me was at Mohegan Sun, and they see me

15   getting escorted out.

16        Q.    So it is your testimony that other people

17   witnessed the event at senior night and Mohegan Sun?

18        A.    Yes.

19        Q.    And people that were there then knew --

20        A.    Mm-hmm.

21        Q.    -- of your situation?

22        A.    Yep.

23        Q.    Did you seek any treatment for any of the

24   embarrassment, any of the feelings you were having?

25        A.    Just talked to family members.

64

1       Q.      Now, you've since attended Capital Prep

2   events, right?

3       A.      I went to -- The following year, 2014, I

4   went to Mohegan Sun again for the championship between

5   all the schools.

6       Q.      Was Capital Prep in the game?

7       A.      Capital Prep was there.

8       Q.      And you stayed for the game?

9       A.      No incidents.

10              And my daughter has been out of school

11  for two years now, and I have people at my job telling

12  me, Oh, you're the one.

13              My name is in lights at the school for

14  all the crap he's done.

15      Q.      Again, how did it get "in lights," to use

16  your term?

17      A.      Once again, students, faculty, parents.

18      Q.      Do you have any knowledge or information

19  that Dr. Perry is -- was telling parents or students

20  what occurred?

21      A.      No, I do not.

22      Q.      In looking at the discovery

23  responses again, Defendant's Exhibit 2, if you

24  go to number 11 -- Actually, on the second page there,

25  if you turn to the next page, there's mention here

65

1    about the grade discrepancy.  You told me a little bit

2    about it.  I want to make sure I have all the

3    information on it.  You told me before about your

4    daughter in one of her classes having an A in one

5    semester and doing well, I think throughout the year,

6    and then her final grade being an F.

7             A.    Mm-hmm.

8             Q.    Is that summarizing it pretty accurately?

9             A.    Yes.

10            Q.    Now, did the grade discrepancy eventually

11   get cured?

12            A.    I know my -- I don't know.

13                  Can I check with my wife and see if she

14   came up?

15                  (Whereupon, a recess was taken.)

16   (Whereupon, Ms. Johnson enters the proceedings.)

17   BY MS. MIZERAK:

18            Q.    Mr. Johnson, we are back on the record.

19                  Before we had left I think I was asking

20   you about discovery response number 11 in Exhibit 2.

21   That was just about the grade discrepancy.

22            A.    Yes.

23            Q.    And there's a statement, As a result of

24   the discrepancy on her transcript, I feel as though my

25   daughter was unable to get into colleges that

66

1    otherwise she could have.

2              I guess my question is are there schools

3    that your daughter decided not to apply to because of

4    this grade discrepancy?

5         A.   I think there was schools that didn't

6    look at her because of the grade discrepancy.

7         Q.   And you are not sure if it got resolved?

8    Is that what you are saying?

9         A.   No, I am not.

10        Q.   What schools do you think didn't look at

11   your daughter?

12        A.   We have it in the folder at home.  I

13   couldn't tell you.

14        Q.   Did they give a reason that --

15        A.   I don't know.

16        Q.   Then we are going to keep on Exhibit 2,

17   and when you are ready I'm going to point you to an

18   e-mail that's attached.

19              If you look at this page towards the

20   bottom part of the page, there's an e-mail, looks to

21   be directed to Ms. Bentham, dated January 31st, 2013.

22              In the "from" line it says "Norman

23   Johnson," but in the body of the e-mail it looks to be

24   from Ms. Johnson.

25        A.   Correct.

67

1      Q.    And in the e-mail, if you look in the

2   one, two -- third line, it says, Last year there were

3   many problems so I advised my daughter not to play

4   this year.

5      A.    Correct.

6      Q.    So I guess I'm a little confused because

7   I -- In the complaint, if you look in count 1, in

8   Exhibit 1, paragraph 6, The plaintiff's daughter

9   decided that she preferred only to play junior varsity

10  basketball so she could have the opportunity to

11  actually play the game.

12         So I just want to understand the reason

13  why she decided not to play varsity.

14     A.    Because she wasn't getting the time.

15     Q.    And then also in that e-mail towards the

16  end, the second to last sentence, On Today, I received

17  an e-mail stating that        had to play in a varsity

18  senior night game, and she's no longer on varsity.

19         I know you didn't write this e-mail.  Do

20  you know what that was referring to, what that other

21  e-mail, that might have been from, the e-mail with

22  respect to        having to play in the senior night

23  varsity game?

24     A.    No, I don't.

25     Q.    Keeping in Exhibit 2, turn one more page,

68

1    and towards the bottom of that page there's another

2    e-mail dated January 31st, 2013, again, the from line

3    is Norman Johnson, and it looks to be addressed to

4    Mr. Perry.

5          A.    Okay.

6          Q.    And there's a number of people's names in

7    the e-mail that I just want to make sure I understand

8    who these people are.

9                In that very first sentence, We are

10   sending you this correspondence due to a bullying and

11   harassing situation which originated with          !,

12   Daima Privott,     ι, Bonnie and     · Johnson.

13         A.    Yes.

14         Q.    So ι     `        --

15         A.    '        ."

16         Q.       ··     , who is that?

17         A.          is a classmate of      and a

18   teammate on the basketball team.

19         Q.    And the next individual?

20         A.    Daima Privott, that is her mother.  That

21   is the one that I was telling you about the e-mails.

22   I mean, not the e-mails, the text messages.

23         Q.    Is Ms. Privott the parent who you had the

24   conversation with at a game?

25         A.    Yes.

69

1          Q.    Again, that was about play time with your

2    daughter?

3          A.    Yes.

4          Q.    Towards the bottom of that e-mail, about

5    six lines up from the bottom, it says, After I left,

6    she met with       alone at first.  She told her that

7    she could not guarantee her any playing time.  She

8    thought the whole incident was petty.  My husband came

9    at her, and that she would not fight fire with fire

10   among other comments that we need to discuss in

11   person.

12              My understanding is that "she" is

13   referring to the coach, Coach Millsap.

14         A.    Yes.

15         Q.    Do you know what is meant by "my husband

16   came at her"?

17         A.    Well, she said that I -- the way I

18   approached her as my daughter would not be playing

19   varsity.

20         Q.    So your understanding is the way you

21   approached her is what's referring to "my husband came

22   at her"?

23         A.    That's my belief.

24         Q.    Did you ever have a conversation with

25   Ms. Millsap about this incident that occurred at this

70

1  game?

2      A.    Yes, that was the night that I told her

3  that my daughter would not be playing for her no more;

4  she will be playing JV for Ms. Lewis.

5      Q.    So that was January 31st, 2013?

6      A.    Okay.

7      Q.    Based on the e-mail.

8      A.    Yes.

9      Q.    Now, this incident that's described in

10 the e-mail, did you have any argument with Ms. Privott

11 at the game?

12     A.    No.   What I told her was I didn't

13 appreciate what she had said to my wife, and she

14 instructed me that that is between you and the coach

15 and to get away from me before I get mad.

16            And I left her.

17     Q.    And remind me again, what did she say to

18 your wife?

19     A.    She told my wife, You don't expect her to

20 play in a high profile game like this, do you?

21            And then, as I told you before, then she

22 went on with the text messages all night talking about

23 how my daughter sucked and different things.  It just

24 got crazy.

25     Q.    And then just tell me everything you said

71

1    to Ms. Millsap that you can remember on that night.

2         A.    I said, Why didn't you let    i play?   I

3    said, That's okay.  You don't have to worry about it.

4    She's not playing for you no more.  Ms. Lewis told me

5    she could play for her, and that's the way we'll leave

6    it.  She'll just play JV.

7         Q.    I'm just going to show you another e-mail

8    here, again, keeping in Defendant's Exhibit 2.  Now,

9    this e-mail is dated February 6th, 2013.  Again, the

10   e-mail "from" line says Norman Johnson.  It looks to

11   be addressed to Mr. Perry.  It is also copied to two

12   individuals.

13         Do you know who those individuals are

14   that were copied on the e-mail just by looking at the

15   e-mail address?

16         A.    No, I do not.

17         Q.    About four lines down there's a

18   statement, After we told you that she's no longer a

19   varsity basketball team player due to her being

20   targeted and harassed by coach Tammy Millsap.

21         So I think we established that your

22   daughter didn't want to be on varsity anymore because

23   she wanted to get more play time.

24         A.    Correct.

25         Q.    So is the targeting and harassing by

72

1    Coach Tammy Millsap your daughter not getting enough

2    play time?

3          A.    Or of her telling her you are going to

4    play -- You know, basically the same thing, that you

5    will be playing varsity, and I'm not going to

6    guarantee you any playing time.

7          Q.    To your knowledge, did Coach Millsap ever

8    say to ▮▮▮▮ why she thought she should play varsity?

9          A.    No, I don't know.  See, they had made

10         --      was a co-captain, and they took it

11   away.

12         Q.    When did that occur?

13         A.    Early on.

14         Q.    In the senior year?

15         A.    Yes.

16         Q.    Who took it away?

17         A.    Millsap.

18         Q.    Do you know why?

19         A.    No, I do not.

20               MS. MIZERAK:  Can we mark this.

21               (Whereupon, Defendant's Exhibit 3,

22   December 5, 2014, responses to discovery request, were

23   marked for Identification.)

24   BY MS. MIZERAK:

25         Q.    I'm handing you Exhibit 3.  It's the

73

1   responses to the discovery request.  I want to look at

2   the first question.  We can talk a little bit about

3   that.

4           And this response goes through the

5   meetings that I've already asked you about as far as

6   meetings with Dr. Perry on February 7th, 2013, and

7   other meetings that were had that you indicated with

8   Mr. Fulton and Ms. Johnson and          .

9           A.    Okay.

10          Q.    If you turn to the second page, there's

11  sort of a summary, a lot of which you told me about as

12  far as the February 7th, 2013, meeting and what

13  occurred.

14          About five lines up, Mr. Perry said that

15  she is a liar and manipulator, and then looked at

16  Millie and said, You know who to believe.  I told him

17  he was a liar and manipulator and he was full of shit.

18          So you told me a little bit about that's

19  what occurred.  So you told Dr. Perry that he was full

20  of shit too?

21          A.    Yes, did I.

22          Q.    And then the meeting was over,

23  essentially.  He flipped out and start hollering,

24  Don't you ever talk to me like that again.  I told

25  him, Oh, it's okay for you to say it?

74

1          And then he said the meeting was over.

2          A.    Yes.

3          Q.    If you could go back to Defendant's

4    Exhibit 2, question number 4 -- I'm sorry.  Now I'm

5    confused.  Exhibit 3.  I apologize.  It's the 12/5,

6    2014.  Number 4 on that particular discovery response,

7    that's asking about a phone log.

8          My understanding based on these responses

9    and the response on Exhibit 2 is that there was some

10   phone log indicating calls that you might have made to

11   various Board of Ed people.

12         Do you remember recording any type of log

13   to that effect?

14         A.    No.  What I had did at one point was I

15   was keeping them in my cell phone, and then after

16   awhile they get erased.

17         Q.    They get purged after awhile?

18         A.    Yes.

19         Q.    So it would be fair to say on your cell

20   phone it would show what calls were made, obviously,

21   but after awhile that would all just be erased as time

22   would go by?

23         A.    Yes.

24         Q.    I want to make sure there was no paper

25   log that you were keeping where you would say on

75

1    March 1st I called Jonathan Swan and this is what we

2    talked about.

3         A.    No, I would do this while at work.

4    Sometimes I'm working and I can't stop and write down

5    who I talked to.

6         Q.    Sure.  Okay.

7         A.    I still have a recording on my cell phone

8    from Martha Bentham that I keep.  I keep refreshing

9    it.

10        Q.    Do you remember what that message was

11   about?

12        A.    It was in reference to the harassment and

13   stuff with my daughter.

14        Q.    Is that something that you could produce

15   and make a copy of?

16        A.    I'll play it for you right now if you

17   give me a little time to find it.

18        Q.    Maybe after.

19                  MS. MIZERAK:  Joe, maybe you could get

20                  it to me or let me listen to it.  That would

21                  be helpful.

22                  MR. MERLY:  All right.

23   BY MS. MIZERAK:

24        Q.    Did you save any other messages as

25   related to this incident?

76

1          A.      I just have one that's -- I guess because

2     we are on the phone system, Mr. Perry saying there's a

3     Capital Prep because of you, you know, and I do have

4     that on my phone as well.

5          Q.      I don't know that I understand.

6          A.      It's something that comes on his -- I

7     know I can't talk to my wife, but there's something

8     that comes on announcements, and it came to my phone,

9     and this was like after all of this.

10         Q.      Was it an announcement that would go to

11    all the parents?

12         A.      Yes.

13         Q.      So it was an announcement that would go

14    out to all the parents from school?

15         A.      Yes.

16         Q.      Thank you.   That's helpful.

17         A.      I also have a phone call, since we're

18    talking about the phone, of my mother-in-law calling

19    me asking me did they come and approach me again

20    because we called her and let her know what was

21    happening at Mohegan Sun.

22         Q.      In looking at Defendant's Exhibit 3,

23    number 4 there, you know, it was asking for dates that

24    phone calls might have occurred, and the answer

25    between January 28th, 2013, and June 7th, 2014; and

77

1    I'm just curious if you can remember -- because

2    June 7th, 2014, would have been a year after

3    graduated, right?

4           A.    The date is wrong.  It was probably 2013.

5           Q.    So you think it was June 7th, 2013?

6           A.    Yes.

7           Q.    Have you ever referred to yourself as

8    Stormin' Norman?

9           A.    Yes.

10          Q.    Is that like a nickname or is that -- How

11   did that come about?

12          A.    That was a nickname that I had got from a

13   friend.

14          Q.    How did you get that nickname?

15          A.    I don't know.

16          Q.    Not sure?

17          A.    They just started calling me Stormin'

18   Norman.

19          Q.    Is it a nickname you've had for awhile?

20          A.    Yes.

21          Q.    The year 2013 when Capital Prep was in

22   the championship game, they won that year, right?

23          A.    Yes.

24          Q.    And when they won in March 2013, your

25   daughter was not on the varsity basketball team,

78

1   right?

2           A.      Correct.

3           Q.      She didn't play in that game then?

4           A.      No.

5           Q.      So she wasn't on the varsity roster at

6   the time that they won that championship game, right?

7           A.      No.

8           Q.      I want to go back.  I'm sorry to jump

9   around, but there's more attachments in Exhibit 2 that

10  I want to talk about briefly.

11                  So we're going to go back to that

12  February 6th, 2013, e-mail.  It's actually on the

13  second to last page of Defendant's Exhibit 2.  Again,

14  that's an e-mail to Mr. Perry dated February 6th,

15  2013, and the "from" line says from Norman Johnson.

16          A.      Okay.

17          Q.      If you look about four lines down it

18  says, After we told you that she is no longer a

19  varsity basketball team player due to her being

20  targeted and harassed by Coach Tammy Millsap.

21                  We talked about this statement a little

22  bit before.  When did you tell Dr. Perry that she,

23         , was no longer a varsity basketball player?

24          A.      We had actually told Millsap back in

25  January.  Then we told Fulton at that meeting where me

1    and him were shaking hands.  I don't know the date.

2         Q.    So you told Millsap and Fulton, and then

3    I know at the February 7th, 2013, meeting where

4    Dr. Perry was present the discussion, in part, was

5    about her not playing varsity basketball.  At that

6    point you told him?

7         A.    Yeah, because that was the first meeting

8    that he attended.

9         Q.    Now, why do you think Mr. Perry -- Why do

10   you believe you were trespassed from the school?

11        A.    I don't know.

12        Q.    You don't know?

13        A.    I don't know.  Like I said before, it was

14   okay for him to make a statement about my daughter,

15   and I turned around, used the same statement back at

16   him.  He didn't like it.

17        Q.    Then if you stay with Exhibit 2, it's

18   actually the third to last page.  Now, this e-mail is

19   from Mr. Perry.  It's dated Sunday, February 10, 2013,

20   and it looks like it's -- based on the e-mail

21   address -- I believe it's given to you, sent to you.

22             Is this the e-mail you received from

23   Dr. Perry as far as the being trespassed from the

24   Capital Prep events?

25        A.    I believe it to be.

80

1          Q.    And I appreciate that this is from

2    Dr. Perry and it's stating why he's doing what he's

3    doing.  You know, I appreciate that you disagree with

4    that, but in that second paragraph it does say your

5    verbal altercation and direct threats to staff have

6    created an unsafe environment to staff and other

7    parents and will no longer be tolerated.

8               That's in the e-mail, right?  You see

9    that?

10         A.    Yes, but can I say something on that?

11                    MR. MERLY:   Well...

12                    MS. MIZERAK:   There's no question.

13                    MR. MERLY:   You can respond to her

14               question.

15         A.    I would like to know who.  Who was I ·

16   supposed to have these altercations with?

17         Q.    I don't know, sir.  The e-mail is what it

18   is.

19         A.    I'm like this:  If he threatened me and I

20   come in the building and I reach out to shake his

21   hand, he's not a threat.

22         Q.    I just want to make sure.  I think I have

23   it.  I don't want to beat a dead horse here, but there

24   was essentially one meeting that you had with

25   Dr. Perry on February 7th, 2013.  There were no other

81

1    meetings that you had with him?

2         A.    Correct.

3         Q.    If you look at Exhibit 1, going back to

4    the complaint, if you look on page 3 and count 1,

5    paragraph 10, In fact, the defendant was lying and

6    plaintiff's daughter was telling the truth.

7              And then paragraph 11, In response, the

8    defendant banded the plaintiff from all school events

9    except commencement, a banishment never before imposed

10   on any parent.

11             So I guess what I'm trying to get from

12   you is what evidence you have that the trespass was

13   based on your claim that, essentially, you caught the

14   defendant lying and then you told him so.

15        A.    The e-mail.  That was our only...

16        Q.    By "the e-mail," you are referring to the

17   e-mail that you received from Dr. Perry on the 10th of

18   February --

19        A.    Yes.

20        Q.    -- where it states that you are not to

21   come to any Capital Prep events?

22        A.    Mm-hmm.

23        Q.    That e-mail does not say anything about

24   the claim that you caught him lying, right?

25        A.    No.

82

1          Q.     Other than the e-mail, do you have any

2      other evidence so substantiate why it was you were

3      banned from Capital Prep events?

4          A.     I don't think so.

5          Q.     In the complaint, Exhibit 1, count 4 is a

6      claim for Intentional Infliction of Emotional

7      Distress.  I'm just going to refer to it by its

8      initials, IIED, so it's easier.

9               We have talked about a lot of things so

10     far.  I just want to make sure you've told me

11     everything, every fact, that's the basis of that claim

12     for IIED.

13         A.     Yes.

14               MS. MIZERAK:  I don't think I have

15               anymore questions.  I don't know if you are

16               going to ask any questions.

17               MR. MERLY:  No questions.  We are all

18               set.

19               (Whereupon, the deposition was

20               concluded at 1:22 p.m.)

21

22

23     (Exhibits retained by Attorney Mizerak.)

24

25

83

1
2
3                      NORMAN  JOHNSON
4
5
6
7    STATE OF CONNECTICUT   :
8                          :   ss
9    COUNTY OF _____  :
10
11
12              On the ____ day of _____,
13    2015, before me, the undersigned Notary Public,
14    personally appeared NORMAN JOHNSON to me known to be
15    the person who has subscribed to and executed the
16    foregoing deposition after having read and corrected
17    it in every particular desired, and acknowledged that
18    he executed the same as his free act and deed.
19
20
21              _____
22                      Notary Public
23                      My commission expires _____
24
25

84

1                                 ERRATA SHEET

2

3                                 CORRECTIONS

4

5      Page            Line             From                    To

6

7

8

9

10

11

12

13

14

15

16

17

18

19     Johnson vs. Perry
       Case Name

20
       Norman Johnson
21     Deponent

22     February 13, 2014
       Date of Deposition
23

24

25

85

```
 1   STATE OF CONNECTICUT   :
                            :  ss
 2   COUNTY OF LITCHFIELD   :

 3              I, Denise M. Mancini, a Notary Public, do

 4   hereby certify:

 5              That NORMAN JOHNSON was by me duly sworn in

 6   the within-entitled cause;

 7              that said deposition was reported by me,

 8   a Licensed Shorthand Reporter, was thereafter

 9   transcribed under my direction and is a true and

10   complete transcription of all testimony given by said

11   witness.

12              I further certify that I am not a

13   relative, counsel or attorney of any party, or

14   interested, financially or otherwise, in this action.

15              IN WITNESS WHEREOF, I have hereunto set

16   my hand and seal at Winsted, Connecticut this 24th

17   day of  February  , 2015.

18

19

20              Denise M. Mancini

21

22              Notary Public, LSR NO. 00357

23              My commission expires May 31, 2019

24

25
```

86

1                              I N D E X

2
                                                      Page
3      NORMAN JOHNSON

4

5
                          DEFENDANT'S EXHIBITS
6
       No.        Description                          ID
7
       1          Complaint                            15
8
       2          Discovery responses                  60
9
       3          December 5, 2014, responses to       72
10                discovery request

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25